Mr. Chief Justice, and may it please the Court. This Court has long held that, because of the importance of free speech in our country, categorical exceptions to the First Amendment's prohibition on content regulations must be well-defined and narrowly limited. Speech cannot be exempted without proof of a long, settled tradition of subjecting that speech to regulation. The State has not come close to meeting its burden of showing a long, settled tradition of punishing true threats without proof the Speaker knew that a statement would cause fear. In the face of early cases and treatises showing the central importance intent played in speech prosecutions, and threat prosecutions specifically, Colorado cannot cite even a single decision holding that subjective intent is irrelevant. The best it can do is cite cases that were silent about the required intent in the face of unambiguous threats. The State tries to conjure a tradition of punishing negligent threats by analogy to other categorical exceptions, but generally they require at least recklessness. The closest analog in citement requires specific intent. At bottom, any claim of a settled tradition of criminalizing negligent threats is impossible to square with Virginia v. Black, where this Court reversed convictions for cross-burning that would have easily satisfied a negligent standard in a series of opinions emphasizing the central importance intent plays in making threats constitutionally prescribable. While the State predicts harm, it has shown no difference in criminal enforcement or the availability of civil protective orders in the many jurisdictions that already require subjective intent. There, prosecutors prove mens rea the same way prosecutors always have under countless criminal statutes, through objective evidence of the defendant's words and actions. Criminalizing misunderstanding is especially dangerous in an age when so much communication occurs on social media, which brings together strangers in an environment that removes much of the context that gives words meaning. And it chills expression by imposing prison time on speakers who do not tailor their views to suit their audience. This Court should reverse. I welcome the Court's questions. Mr. Elwood, I don't quite understand why you would cite Black when Black did have an intent requirement. The question was whether or not the presumption of cross-burning in a field overcame that intent requirement or demonstrated that. If intent wasn't constitutionally required, there isn't any reason why it couldn't be presumed away. Maybe that would raise a due process issue, not a First Amendment issue. And the Court focused the discussion on intent and the constitutionality of the First Amendment issue. And the plurality specifically said that the state had presumed away the thing that makes threats constitutionally prescribable. And in addition, Justice Scalia said that the constitutional defect was in preventing the consideration of the intent of the people who burned the crosses. So I think from that, you can at least say it doesn't establish, it's not consistent with a clear tradition of criminalizing negligent threats. One other thing. There are other categories. And just take, for example, obscenity. You don't have a subjective intent requirement there. So why should these true threats receive more protection than obscenity? I think especially under Alonis' gloss of Hamlin, Hamlin said that you had to know not only the contents but the character of obscene materials, which the Court described in Hamlin as the conscious purveyance of filth. And in Alonis, the Court said that that was equivalent of knowing that your statements would cause fear. So I think that it is entirely consistent with the idea that there is a subjective intent requirement, at least at the knowledge level, which is all that we are asking for here. What about fighting words? Fighting words, people always look to Czaplinski, but I think that's over-reading about a page and a half of analysis in a case that didn't clearly present it. I think what Czaplinski definitely decided was that that statute wasn't vague and that shouted epithets were not themselves protected, but it didn't really address the mental state element. In addition, I think if you look at the tradition that comes from the common law tradition, breach of peace, when it uses threats, which is part of what is covered in Czaplinski, there is definitely a specific intent requirement. Subsequent cases by this Court have used language saying calculated to provoke a fight and things like that. And regardless of all of that, fighting words is a very vanishingly small exception for basically nose-to-nose shouting of epithets that are likely to cause a breach of the peace and where police might need to step in regardless of knowing the person's intent. I don't think it's a, you know, the Court has declined to extend it under numerous circumstances. There would be smaller steps than extending it to, you know, online communications. You say that even if you prevail, the courts will still be able to freely impose civil restraining orders, and Colorado takes issue with that. Why wouldn't your same standard apply in that context? Well, a couple of things. To begin with, a lot of, I mean, especially in the stalking context, you know, Colorado has a statute that, you know, allows prosecutions that don't require looking to the content of speech that are rather based on conduct. And so for that, obviously, I don't think it would make any difference at all. But even with it, the standard is lower for getting a civil protective order. Colorado's is relatively high at a preponderance standard, but most states use a good cause standard or a discretionary standard. And, you know, that's below probable cause. And people get, you know, you can get arrest warrants, you can arrest people for specific intent crimes, you know, just based on the objective words. And that is, you know, plenty of evidence of the intent of this, plenty of evidence of the intent of the actor, even at the higher standard of probable cause for good cause. I don't think that it should be an issue. And as we've said, as I said in my opening, there are, you know, many states, over 20, that have, for the threat statute, have a subjective intent standard. For stalking, there are, you know, 14 states that have an intent standard and three more that have kind of a recklessness standard. And, you know, there's no indication that even when it's baked into the stalking statute, that it presents an issue for getting civil protective orders. Mr. Elwood, I just want to follow up on that in two respects. One, on the civil protective order side, you're not suggesting, I don't take it, but I want to make sure, that the mens rea that we typically require in criminal cases, the vicious will that Morissette talks about as being part of our common law criminal tradition necessarily carries over into the civil context. Absolutely not. Absolutely not. The only potential feedback is in states that require proof of a crime, it might be baked in through that route. But as a direct measure, the argument we're making is based on the chilling effect of criminal liability. And second, with respect to the stalking possibility under Colorado law, I mean, the statute's very broad. I understand this particular prosecution had something to do with speech, but I don't take your argument, and I just want to make sure I've got it right, I don't take your argument to be upsetting at all. Prosecutions based solely on conduct, so that conduct, stalking, is an entirely separate matter than speech, and that what you're concerned about is the mens rea with respect to speech. I think that's exactly right. Essentially, only when the focus of the prosecution is on the threatening nature of the words, you even have to get into the truth, rights, exception. Otherwise, if it's frequency and repetitiveness of unwanted conduct, I don't think that presents even a First Amendment question, or at least not the First Amendment question we have here. Mr. Elwood, could I take you back to the first part of Justice Gorsuch's question? Because if your basic argument is one about First Amendment chill, I'm not exactly sure why it should make a difference that there's a criminal prosecution here as opposed to civil action. And indeed, when we talk about libel, I think one of the first cases after New York Times v. Sullivan presented exactly that question, and the court said a sanction is a sanction, whether it's criminal or civil, it might have the same kind of chilling consequences. So as far as I know, in past First Amendment challenges of this kind, we have not drawn that distinction, even though it might be a quite natural one. So how do you think we should draw that distinction here? Well, I think that it's consistent with the way the court has treated defamation, because defamation in the civil context, for public figures, it has the elevated kind of recklessness standard, and it's also there in the criminal standard. But for private individuals, it can be basically as long as it's not strict liability, with the exception of punitive damages, where they say, again, you need to have the showing of recklessness. And I think that is consistent with the idea that punishment is different from just civil liability making people whole, that even though the court in Kurtz v. Robert Welch didn't dismiss that that has some chilling effect, civil liability, they said that it wasn't enough of a chilling effect to offset the state's legitimate interest in making people whole in the civil context. Mr. Elwood, the briefs are full of discussion of general intent and specific intent, which I find to be very confusing terms, because criminal statutes have multiple elements, and each element can have a different mens rea. So I would like you to talk about this using the methodology of the model penal code. So if we look at the elements, do you agree with me that the element that we're talking about here is that, as applied to a prosecution based on the content of communication, the content must be such as to cause a reasonable person to suffer serious emotional distress? And the question is, what is the mens rea for that element? Are we together up to that point? I think we are together up to that point. Okay. So if we consider that using the mens rea variations set out in the model penal code, is it purposefulness, is it knowing, is it recklessness, is it negligence? What do you think it must be to satisfy the First Amendment? I think that it should be knowledge of the thing that makes the conduct wrongful. In most threat statutes, that's knowledge that the words you use are going to cause fear. I could see with the Colorado statute that it would be knowledge that it would cause a reasonable person to suffer emotional distress. Okay. So you don't think purpose is required, but knowledge is required. Knowledge, yes. That is our argument, is that it's kind of the minimum mens rea to make the conduct wrongful. Why wouldn't recklessness be sufficient? I mean, it's culpable. Reckless conduct is morally culpable, and a threat causes damage regardless of the intent of the speaker. Why isn't that sufficient? I think recklessness would be a big improvement over a objective standard because it at least is focusing on the mental state of the speaker, which I think presents a chilling risk. I think where recklessness has a problem is in doctrine and in history. I think it has a problem in doctrine in terms of the convictions in Virginia v. Black would have been very easy to uphold on a recklessness standard. One of them burned a cross on a neighbor's yard, and I think that that is at least reckless that it's going to cause somebody fear. And it has a problem, I think, in history just because the early cases, and I'm thinking here of Virginia v. Hill, which is a British threat statute case, and the American case, which is a breach of the peace but through threats of Benedict v. State v. Benedict, spoke in terms of specific intent. And I think that that is harder to square with recklessness because the statements at issue there were at least reckless that it would cause somebody fear. Well, I have one other question. It's somewhat different. In order for there to be a conviction based on content, the communication must in fact constitute a true threat, right? I believe so. I mean, at least as this case comes to us, the threats were really central to the prosecution, and I think that when essentially the basis for the prosecution is the content of the communication, that it should be a true threat. Okay, so that depends on the meaning of the communication. And my question is whether speaker intent is not built into that because the meaning of a communication and utterance is dependent significantly on the intent of the speaker. I think that that's true, but I think to begin with, there are a lot of statements that are ambiguities, a lot of statements that are ambiguous. And I don't think that the rule we're asking for would make a big difference in a lot of cases, but it means that essentially the jury's going to start out with, what do these words normally mean? And in most cases, what those words normally mean is going to be the mental state of the defendant, too. All this we're asking for is that people should be able to make their case to the jury. And unless they have a persuasive argument for why those words meant something different to them, I think that the jury will say, this is enough. Yeah, well, this isn't meant to be a hostile question for you. It's one that I'd like the state and the SG to think about. But isn't it inevitable that speaker intent is going to be important regardless of the mens rea that is applied to the other element that we were talking about earlier? Somebody stood up here and spoke as fast as an auctioneer, and I couldn't understand what they were saying. And I kept saying, would you please speak a little more slowly? Speak more slowly so I could understand what you're saying. And the person just continued to do it. And I said, you know, if you continue to speak that fast, I'm going to have a fit. Now, nobody would think I was actually threatening to have a fit. It depends on my intent in the context. I mean, maybe some people would. So it's built in. Anyway, I just wanted to give you a chance to talk about it, because I think it's a problem for the state's position. I think intent is frequently kind of well, it can be inferred from the way that the statement is made. But it definitely when cases are tried in particular ways, they can definitely abstract it out. Isn't that the point that Justice Alito is trying to make? Yes, he may well be right that a speaker's intent. It would seem to me whenever you're trying someone for a First Amendment violation involving speech for any conduct, criminal or civil, that the speaker's intent should be part of the presentation the jury gets, because that's part of the circumstances. But here, the court and the prosecutor argued that the intent was irrelevant, that he couldn't present any evidence about his intent. Correct? That is exactly about his mental state, about what he thought. They precluded him completely from doing that. So how this was charged was in the aloneness sense. In the aloneness sense, you just have to know you said these words, not what you thought they meant, but you said these words, and that a reasonable person would understand it that way. And aloneness said, no, that's a negligent standard. So the only issue before us is, I think, are we going to approve of a pure negligent standard that doesn't take into account any of the intentions of the speaker when we prosecute for speech? That's really the bottom line, correct? That is the bottom line, and this case isolates that because the S.G., who's an amicus, is the only one who raises at the end of their brief that if we reject, as we did in aloneness, negligence, that we should go on, even though it wasn't the basis of the case before us, to decide that It's not how the case was presented below, and the actual parties of the case or the party to the case has not ever attempted to affirm the conviction on the basis of recklessness. Exactly. And so that issue, like in aloneness, just hasn't been raised by this case. I would agree with you that under the principle of party presentation, that has not been raised. It's only been raised by the civil-criminal line. It follows up on Justice Kagan. It seems to me that what we're talking about is defining the content or what it means to be a threat, right? Because if the First Amendment excludes threats because they're not socially valuable speech, we're looking at how to define a threat. So I guess I don't understand why, and maybe I misunderstood you, but it sounds to me like you're defining it a little bit differently in the civil context than the criminal context, right? I'm not entirely sure how to answer the question, because in the civil protective orders, many of them don't require showing a crime. Some of them do require showing a crime. And so I don't know that there really is an issue about civil threats. But let's imagine this example. Let's say that a teenager in a high school says something like, you know, I'm going to shoot this place down. And it's devoid of all context. So let's say it's more like the statute in Virginia v. Black, which instructed that just the burning of the cross was sufficient for the jury to infer intent. So let's say there's no context at all. But the school, taking the threat to the school seriously, wants the kid to be barred from the grounds or wants him to be suspended for a few days so they can assess the threat. But it's not a crime. It's just deciding whether to keep him out. But it would be state action. What about that? Could the school do that just based on that one statement? I believe so. Schools have extra leeway, and schools are a whole ball of wax. Okay. Make it the father. Make it the father, not the student. Or make it a teacher. So tinker is not implicated. Or the teacher. The teacher says, I'm going to shoot this place up. And they want to just put the teacher on leave without pay for a week. I think absolutely so. I mean, among other things, just in terms of public safety, they can go forward based on the evidence they have of what the threat is, which is the words he used. And frequently the best evidence you have of intent is the word that somebody used. And in fact, unless they produce something else, those are the things that they have. In a civil context, let's say they plan no criminal action. Let's just say this is civil, and the idea is you should know better as a teacher. Whether you intended, or maybe the teacher is mentally ill, they don't realize that. Whether you understood that we would take that to be a threat. I guess they just don't understand why the standard would be different. Well, the court has drawn a distinction between civil penalties and criminal penalties. And I mean, I don't know that it's a penalty to have to miss work for a couple of days while they get to the bottom of it, besides whether there's a public safety problem. Well, it is if you're suspended without pay, because the school says this is just something you don't joke around. Well, if the idea is we just want to make him suffer because this is something you don't want to joke around, maybe that is something more like punishment. Although, again, everything is kind of different in the educational context. Why does it turn on, but I guess, again, assuming that it's, because when you were answering Justice Kagan, you were kind of running to the criminal context, like behind every civil restraining order. I kind of feel like that's what you're doing with me, too, is the potential of a crime. And maybe my example isn't effectively communicating it, because I'm trying to make it solely civil. But I guess I don't understand. I mean, in the New York Times versus Sullivan context, intent does matter for the state. In the Alona sense, we would say that what separates culpable from not culpable conduct is the level of intent. And so that mattered in interpreting the mens rea requirements of that statute. But I'm not sure why it changes the definition of threat for purposes of the definitional category of speech that falls outside the First Amendment. Well, I think part of it is just because of the level of protection you get. And in the civil context, losing a couple days of salary can be a significant penalty, but it's nothing like being sentenced to four and a half years in prison. Because I understand you're saying, look, this is a criminal case. This was a very heavy sentence. And really forcing us to say, we have this discomfort with crimes that don't have mens rea. But this is a different sort of question. You're not saying, well, just because a crime doesn't have a mens rea element, it's unconstitutional. Your argument is a First Amendment argument. And I guess I just don't know of very many of our cases, or any of our cases, that have made a real distinction between criminal penalties and civil penalties with respect to what's permitted or prohibited under the First Amendment. Well, the only thing I can point to, again, is the defamation context, where they draw distinctions between civil liability and trouble damages or punitive damages. And the cases like, I think it's Reno versus ACLU, where they've said that criminal penalties pose special concerns. And the place where this would normally arise is in the civil protective order context, which I think is reduced because, of course, the person who is the recipient of the threats of the statements has a First Amendment interest in not associating. And this sorts itself out in other areas because, like in the tort of negligent infliction of emotional distress, you typically can't get that based on, unless you're physically injured, on a negligent standard. It requires, at most, an intentional statement. But I am not aware of a body of First Amendment case law that talks about the civil implications of punishing threats. So the focus is the case before us. And I think defamation is enough of a basis for the Court to say it makes a difference. You said earlier that your position would not make a big difference in a lot of cases. I think you said that. Can you give us examples, not this case, examples of other cases out there where you think someone was criminally prosecuted and should not have been? Certainly. But I think the just versus unjust prosecutions or just versus unjust convictions is a very small part of the argument we're making, because the chilling effect comes from being told it doesn't matter, a speaker being told it doesn't matter what you think. You have to think about the reaction of your audience. And so that is wholly apart from whether there are unjust convictions. I think that this is . . . But in terms of convictions that made a difference, it might have made a difference in the Fulmer case. That's the silver bullets are coming case. And I think there's another case. I mean, one of the broader points I'd like to make to the court is that these kind of prosecutions and these kind of arrests are, I think, substantially underreported, because local media, unless it just happens to catch the fancy of local media, is just not covered. And so some of the best examples are ones that are simply e-mailed to me by spouses or relatives of the people who are prosecuted. But one example is Glenn Schumacher in Illinois, who was a 58-year-old married man who, on the comments page of a local newspaper, the Elmhurst Patch, responded to an article about littering and crowds and so forth at an annual event by saying perhaps if you placed . . . well, pressure cooker pots. And the very next commenter said, you know, we all appreciate some cleverness and humor, but that's pretty crass. So clearly the first person who saw it immediately knew it was a joke. He was arrested at 2 a.m. the next day and held for six weeks on a bond that he could not afford until he pleaded guilty to essentially disorderly conduct. And I think that's an example of a statement that they would say clearly he did not intend that as a threat. He also had no criminal record, but it made a difference in the outcome. But again, that's a very small part of the argument we're making here, which is more focused on chilling. Thank you, Mr. Elwood. To what extent does your case, or is it affected by the fact that we're dealing with text messages, where it seems to me the most threatening message we've got is you're not being good for human relations, die, don't need you. Now, that's there in sort of cold print, but you can convey that message in a hostile way or in a way that's sort of like you're dead to me kind of thing. If this case didn't involve text, how would this material get into the record? Would there be testimony? I think that there would be testimony, and even though it was by direct messages, it came in through testimony as well as they described that in the trial. But whose testimony? Through CW's testimony. Justice Thomas? Yes, just briefly, Mr. Elwood. Justice Alito asked you whether or not intent could be baked into some statements, and that was my problem, by the way, with Virginia v. Black. The burning of a cross in the middle of a field doesn't leave much room to imagination. But what if someone said in a text, I will kill you? What's missing there as to the intent of that person? Well, if it's sent between siblings, you know, talking about, you know, you ate the last brownie, it can mean something entirely different than if it is in the case of, I think, in the interest of R.D. Let's just take your client here. I will kill you. Well, I think in that case it could be open to a lot of different meanings depending on what happens around it. Justice Alito? Suppose someone writes a story, posts it on the Internet or publishes it, and it's a story about, it's a mystery story about one spouse killing the other spouse. Most people are going to read it, but suppose that all of the details match up with the situation of the author's spouse, and when that spouse reads it, the spouse takes it as a threat. How do you analyze that? I think, you know, in the sort of law enforcement context, I think you can stop. I think the application of the test with the objective test is about the same, because it is what would the ordinary person think these words mean, given all of the information that is out there. If you talk to the guy and you are absolutely convinced that, you know, he didn't mean it, he didn't mean to instill fear, he just thought these are great facts for a story, it makes the law enforcement decision easier. If you have doubts, if you think maybe he's doing this to instill fear, well, then, as they used to say in the old 40s movies, tell it to the judge. You know, you treat it just like you would under an objective standard. You indict the guy, you go to trial, and then he has an opportunity to tell the jury. And if it's a persuasive explanation, it's enough to introduce reasonable doubt they might get acquitted. What about the converse? So the spouse reads it, and suppose it's written in the first person and talks about what the author of the story is going to do. The spouse reads it and says, well, you know, this is just my husband or my wife is an author, he or she is just trying to write a story. But a neighbor reads it and says, wow, this matches up exactly with their situation, and I interpret that as a threat to commit murder. What about that? This is a problem with Internet communications, because they go out to sometimes a vast and unknown audience. I think that this is an argument in favor of looking to the speaker's intent, because it's the same outcome in both cases, whereas depending on the state that would apply it, you know, sometimes there's a reasonable person, sometimes there's like a reasonable foreseeable audience. And the effect may differ depending on what the person thinks are reasonable, how a reasonable person would view that. I think that's one of the problems with objective standards generally, is it is a rough and tumble of factors, and you don't necessarily know how they would apply in any given case. The court has said time and again how that yields unpredictability, which is bad for speech. Thank you. Justice Sotomayor? I think, in fact, there's a point, and I think you've made the point, but I want to underscore it for myself, which is if you don't have some sort of subjective intent in a circumstantial case, you're baking in, in the objective reasonable viewer, a sort of bias to whatever that jury thinks might be the community standard. And what's okay for a video game person, player, or a rapper is a very different thing than would be for a non-parent person. I agree. Judge Floyd on the Fourth Circuit has a very good separate opinion on this in United States v. White, where he talks about how essentially minority viewpoints, minority religions, fringe speech, fringe art, tends to be viewed as threatening to people who are unfamiliar with it, which is, I think, the reason why Jehovah's Witnesses are petitioners in about 30% of free speech cases, because it's a minority religion which is unfamiliar and seems weird and threatening to the residents of New Haven, Connecticut. So more of a reason that you have to let in people to explain the basis of their intent, correct, or their knowledge. I would agree, yes. Justice Kagan? Mr. Elwood, the two areas where we've insisted that states have buffer zones or breathing room, which are libel cases, public figure libel cases, and incitement cases. In both those cases, there's a very thin line between the no-value speech and speech that is of great value. So the advocacy incitement line is a very thin one. And so too, when it comes to defamation of public figures, it's just a step from extremely valuable commentary about public figures. And so in those two areas, we've insisted on this breathing room. But I wonder, looking at this case, whether we can really say that. And this goes a little bit to Justice Kavanaugh's question as well. What's the area of speech that we think is really going to be chilled by drawing the line in the place where this state and many other states want to draw it? I mean, there's nothing that's sort of close to true threats but is super valuable that we ought to be worried about. Is there? I disagree. I mean, one of the reasons why we analogize to incitement is the language is frequently exactly the same. We're going to break their damn necks or we might need to take some revengeance. It's a lot of it. It sounds an awful lot like a threat. It's just going to be delivered by somebody else. And so to hear a lot of the examples you can come up with from the Bible believers case, which was an incitement case. But Turner Burn, imagine a protester speaking to a doctor going to an abortion clinic. Turner Burn might be warning about damnation, might be, you know, we're going to bomb your clinic. There's a lot of speech on the Internet that walks the line. You know, burn it all down. You know, come and take it. Second Amendment or Second Amendment remedies. There's a lot of speech online that kind of comes close to the line. And it's not a matter of absolute clarity which way it would fall. And I think it protects that kind of speech, which, again, is virtually identical to the stuff that comes up in incitement cases. The only question is who's going to make good on the threat. Along those lines, the Solicitor General has one of its headings says that a statement that based on its content and context is threatening to a reasonable person has minimal expressive value and is inherently harmful. I guess my question for you is if we were to rule the other way, what's at stake in terms of what's left? How do we know when a reasonable person is going to find something of minimal value and inherently harmful? I would recommend the amicus briefs filed by the Alliance Defending Freedom Reporters Committee, FIRE, I hope I'm not leaving anybody out there, and ACLU because they do a very good job of talking about how when you tell speakers it doesn't matter what you think, what matters is the audience reaction. And instead of thinking about just what do I view as the truth, what do I want to communicate, they have to think about, well, what's going to get me in trouble? And it automatically causes people to chill, to go back to the area where they have safety. And I think that is what you would lose. You would lose some of the rough and tumble of speech, which is especially important on the Internet because, again, as I say, it brings together strangers in an area where you don't have a lot of context. And with strangers, you know even less of that context. Justice Kavanaugh? A couple things. I think the state and the SG say there are certain kinds of threats that they're concerned about, in particular presidential threats, threats against the president, stalking, school threats, domestic violence, and that it's a defense like the one that would be present with your mens rea. It would make it too easy for someone to say, oh, I was just joking, I was just kidding, and therefore threats that would be really quite dangerous in terms of leading to the next step of actually carrying through with the threat will not be addressed. How do you respond to that concern? To begin with, I think that presidential threats after aloneness are already subject to an intense standard. But I will give you an answer similar to the one I gave earlier, which is that this is not going to make a difference in the run of cases because ordinarily the way a reasonable person would view remarks is the way that the defendant probably viewed the remarks, unless they can present some sort of persuasive reason why it meant something different to them. What about the I was just joking, I was kidding? Isn't that a constant concern? You go to the house and the guy says I was just joking, right? And then the police officer is really stuck. Well, you go beyond that and say, because to some people the joke is causing people to scurry around. And if you're like, well, did you know that it was going to alarm them? Did you think that the police might respond? And if the answer to that is yes, that's very easy. If the answer to that is no, it may not just seem credible if the threat was I'm going to kill you or I'm going to come cut your throat. We've had many states that have a mens rea statute. There's over 20 that for the general threat statute require showing a purpose or intent. There's more that requires something less. And there just hasn't been showing that there's a big problem or that it can't be solved or that these people will be granted a license to get away with things. Again, you have to have some sort of persuasive reason why the words meant something different to you. It's not enough to say it's a joke. You have to put together a persuasive reason why you didn't know it would cause fear. And if you adopt the government's recollection, it's even lower, because under recklessness you can't say I had no idea that people would view that as a threat. Thank you. Justice Barrett? Everything you're saying I'm uncomfortable with as a matter of criminal liability, but I guess I'm still stuck on the civil criminal point. And I think Virginia v. Black is your best case, because there is some language in there sprinkled about intent, but I also think the case can be understood as one in which there was no context. The context was stripped away. And so a reasonable person, there was no way to judge as that law was written whether a reasonable person in context would have understood it as a threat. So I don't think it gets you all the way there. I guess to Justice Kagan's point about the thin line between them, won't context protect most often? And a true threat has to be one of physical harm, right? Yes, the true threat has to be one of physical harm. So I mean, a lot of the examples it seems to me that were in some of the amicus briefs and in your brief are ones in which either context or a requirement that something actually be for bodily harm wouldn't be present. I mean, are we talking about a narrow slice of cases in which someone is mentally ill or for some reason maybe autistic and just doesn't appreciate the context? Is that the narrow band we're really talking about? There's a lot baked in there. If I could first talk about Virginia v. Black, I think it's important to remember the default rule, which is whether there is a the best they can get out of Virginia v. Black is ambiguity, not an embracement of negligent speech. In addition, all of the mentions of context there, I say context is important because it helps you determine intent. So again, there's nothing in there to suggest you can have just a context-sensitive objective test. With respect to context and whether context will sort all of this out, in context makes a big difference in a lot of cases, but part of the problem is the foreseeability of that. We already had a little discussion of the many ways I will kill you could be met. And when you're talking about speech, this is again why I refer to that amici, speakers have to have some sort of confidence in advance about whether what they're saying is going to wind them up in trouble. In the past, intent has been a bulwark because speakers know their intent. And so if their intent matters, that gives them some comfort and they can say what they're going to say without criminal punishment. But when the standard is what a reasonable person would think, then you're thinking, well, what does that mean? And frequently you don't know what the answer to that is. We could have a conversation and the conversation about I will kill you could have gone on another five minutes and we might not have gone to ground. Maybe you should be careful if you're going to say something like I will kill you or I'm going to burn it all down or I'm going to shoot up the school. Well, again, but you know, my mother said to me virtually every day of my childhood drop dead. And yet, you know, I was never in fear because of that. And so, you know, context gave you some reassurance. It was about the only thing that did. But thank you, Mr. Allen. Justice Jackson. Yes. So let me just be clear, Mr. Elwood. I'm trying to understand whether you're saying that in every other category of unprotected speech, we require some subjective intent with perhaps the exception of fighting words. Is that right? I think that that's right. That it generally requires recklessness or sometimes knowledge in the case of obscenity. Okay. And then just to follow up on Justice Barrett and Justice Kagan's questions about civil versus criminal. I'm wondering, you say that you your argument relies on the chilling effect. And I'm wondering whether you're perceiving some distinction in a criminal versus civil penalty scheme with respect to the way in which or the amount of chilling that would occur. I think that there is a difference in the amount of occur the grits. I'm sorry. Kurtz versus Robert Welch suggested the difference is constitutionally significant. I do think there is some chilling effect. I think that some of that is baked into the the Gottschall decision, which is this court's case and the negligent infliction of emotional distress, because you can't generally get emotional damages for negligent speech harms. So I think that there is perhaps that reflects some sort of reflection that there is a chilling effect to imposition of penalties. But again, in the defamation context, the court has said that states have a compelling enough interest in making people  indication as a whole that they would let those cases proceed in the civil context. Chief, I'm sorry. May I ask just one question? Sure. Are you saying that you have to always prove somebody intended to commit the act? Or do you have to just say that they knew they were going to put someone else in fear? We are only arguing for a knowledge standard that they knew that the words would cause fear. I don't know if you were finished or not, Justice Jackson. Yes, that's fine. Thank you. Thank you, Mr. Wiser. Thank you, Mr. Chief Justice, and may it please the court. True threats have always been prosecuted without protection by the First Amendment. Petitioner now seeks to impose a specific intent element onto this inquiry that's required neither by history nor precedent. Doing so would enable more harm and less valuable discourse. That's because a serious expression of an intent to cause unlawful physical violence directly causes life-changing harms and does not contribute to the marketplace of ideas, regardless of what the perpetrator was thinking. Requiring specific intent in cases of threatening stalkers would immunize stalkers who are untethered from reality. It would also allow devious stalkers to escape accountability by insisting that they meant nothing by their harmful statements. This matters because threats made by stalkers terrorize victims, and for good reason. Ninety percent of actual or attempted domestic violence murder cases begin with stalking. The court below followed this court's teachings from Watts and The robustness of an objective, context-driven inquiry means that this test won't criminalize a joke taken the wrong way, political advocacy, or hyperbole. It thus protects statements that contribute to the marketplace of ideas. In this case, C.W. reasonably perceived that counterman's threatening stalking conveyed a serious expression of an intent to cause unlawful physical violence. The First Amendment does not protect threats like these in either the criminal or the civil context, and the standard is indeed the same by this court's precedence in both. Imposing a specific intent requirement would thwart the goals of the First Amendment, enabling more harm and leading to less valuable discourse. I welcome your questions. But petitioners arguing, I think a little, I think a bit more. Petitioners also arguing that it has the spillover effect of chilling protected speech, not just that this is protected speech. Now, how would you respond to that? Since Watts, the majority rule in the overwhelming jurisdictions, 50 years, has been an objective standard. And during that time, the only prosecutions they point to, the case he mentioned, civil burlats are coming, was actually a case that was under a specific intent standard. We haven't seen in the last 50 years with this objective rule, the types of harms. And moreover, we point to the time of the founding that threats were prosecuted without regard to intent. But he also argues that you wouldn't see necessarily the chilling effect because those cases would not be before you. That's what I'd like you to respond to. Thank you, Justice Thomas. Justice Kagan got to a critical point. The type of the speech that remains after the first amendment doesn't come close to contributing to the marketplace of ideas. As was said by Justice Barrett, when you're talking about a serious expression of an intent to cause physical violence and harm someone, that's a high standard. Coming very close to that standard isn't the sort of speech that this court has protected under the First Amendment. Well, saying doesn't come close to a protected speech. Here's one of the statements for which he was convicted. Staying in cyber life is going to kill you. Come out for coffee, you have my number. In what way is that threatening, almost regardless of the tone? When it's put into the context, Mr. Chief Justice, what is being said here is if you don't come out for coffee with me, bad things are going to happen to you. I'm sorry, this isn't remotely like that. It says staying in cyber life is going to kill you. I can't promise I haven't said that. Come out for coffee, you have my number. I think that might sound solicitous of the person's development. I mean, if we're talking just about what the statements are, what tone would you use in saying that that would make it threatening? The threat in that is if you don't come out and  Now, in these stalking situations, has someone who believes they're entitled to the attention and the affection of a victim. Victims of stalking routinely face scores and scores. Here are hundreds and hundreds of unwanted, invasive engagements from somebody. And the consequence in stalking cases is if you don't give me what I want, I can turn violent. And that indeed does happen a significant amount of the time. Okay, say this in a threatening way. One of the things he was convicted of, it was an image of liquor bottles, and there was a caption, a guy's version of edible arrangements. Say that in a threatening way. So the threat here is when you put them all together. When you take one of these out of context or put it into a different context, it means something different. But here, she cut him off on Facebook Messenger four to eight times. She got really up to a thousand messages over a couple of years. She was subject to this torrent of activity that was objectively terrifying to her and would be to any reasonable person in that position. And she was helpless, and she could have seen him at a concert, and he could have seen her, and he could have seen her, and he could have harmed her. And she was then afraid to pursue her craft. And under your theory, the defendant couldn't say, right? The first thing anybody would say, a child, an adult, when someone is offended or even feels threatened by their speech is, that's not what I meant. What I meant was, if you stay on the computers all day long, I don't know if it's going to kill you, but it's not good for you. And come out for coffee, it's an invitation to get off the computer. The Colorado standard looks at the context. And the context here was she had four to eight times cutoff access. He kept coming back, kept sending messages in the face of what, again, was a clear sign, I don't want to hear from you. She said at trial, that's the clearest sign you can offer on Facebook. OK, and this will be the last question. Because you're putting it so much in context, he had been doing this, this, and this, could he be convicted for anything, saying anything, good morning, and that's after however many months of doing this? In other words, does the content of the speech actually matter in the way you're looking at it? Yes. The content of the speech that crossed the line was when it escalated to a tone and to statements about her life being at stake. I don't need you. You're not good for me. I said that was the last question, but I was wrong. When you said when it escalates in tone, his messages over time got more aggressive and started using language that got to her physical safety. But tone, to me that means how it's enunciated. We don't have any of that here, right? It's a cold email. The tone of the statements were taken on by the language that was used. When the language got scary and violent and talking about her life, it was a different matter. Also, it's important to note, there were statements, nice display with your partner, seeing you out and about, that also gets to I'm being watched. For a victim in this situation, it is entirely reasonable, appropriate, to see this as terrifying, because we know these stalking cases can and often do turn violent. The statute talks about the manner of the communication. So, do you say that the statute, you interpret the statute to mean that a person cannot be convicted based on the manner of making communications, the content of which is not in themselves threatening? Suppose someone follows a person like C.W. around and is constantly popping up and has a threatening look to the person and is constantly saying good morning C.W., good afternoon C.W., how are you now? The content is benign, but the manner is one that would cause a person to be disturbed. Is that not prosecutable under the statute? There are two different standards. There's the criminal statute and then there's the true threat first amendment requirement. Under the statute, the individual has to have intent in the general sense, knowing what the words mean, and there has to be significant emotional distress to the individual and a reasonable person would have to experience significant or serious emotional stress. So if the statements as they were said would cause an individual to suffer serious emotional distress and someone did suffer that, that would be the standard under the statute. The first amendment then says it has to be a serious expression of an intent to cause unlawful physical violence. It does strain my imagination to plausibly imagine any circumstance where good morning is enough to constitute a serious expression of an intent to cause physical violence. Is that an interpretation of the statute or is that a constitutional requirement? A person cannot be convicted of stalking based on communicating statements that are not in themselves threatening in a manner that is The first amendment requires in order to prosecute a true threat that it be a serious expression of an intent to cause harm. I'm sorry. This goes to the protective order issue. You can engage in conduct of persistent following of someone that would violate a protective order. It wouldn't matter what the person was saying or what they  The consequence of being prescribed is just the stalking. The following that person. And I think what Justice Alito is saying, if there is a statute that says if you repeatedly follow someone or repeatedly reach out to someone in a manner that causes them  You are putting a different overlay on this. And I fear that that might be enough. You are now putting a different overlay on this, which is what the Virginia courts did, which is your speech has to be threatened. That is what Virginia is saying. So I think we're dealing with a different case when we're talking about pure stalking from what Virginia is doing and the way it charged it which was to say it wasn't just her serious emotional distress. She felt in fear for her life. And so they took it as they said it was a true threat case. Correct. Correct. Justice. So if all we have to say is this is a true threat case because that's the way it was tried and that's the gloss that that not Virginia. I'm sorry. What state is this Colorado. I'm thinking of me like Virginia. No, I was just thinking of the flag burning case. It controlled the place in my mind. We don't have to opine on what a true stalking statute is about. That is not concerns with speech. Correct. Yes. If I could explain one minute here. There's three types of stalking cases. There's the pure conduct ones that Justice Gorsuch referred to earlier. There's ones where there are threats. And I thought that was the nature of discussion. There's also a third category of stalking which is dealt with very ably in the do it like here and that is a different analysis. If I could get back to the civil protective order and just I just want to follow up on this before we leave it. So Colorado could have pursued the defendant here for stalking and secured a conviction for that conduct. It wouldn't involve any expressive activity at all. And you'd be out of out of the woods right. Had the conduct been being following somebody around that would have been a different form of stalking case here. The conduct where the statement sent over Facebook Messenger. Sometimes you hear the phrase cyber stalking. The Colorado statute reaches such activity if it meets the relevant criminal statute and First Amendment requirements. And then second kind of back to the Chief Justice's questions. You emphasize the context is really important here. Content and context will do the work. Why isn't the defendant's intentions part of the context. How could it not be part of the context. We've had so many examples here how words mean different things in different contexts. And part of it is how they're received surely. But part of it has to be how they were intended. Isn't that part of the context. The intended and foreseeable audience was a defendant talking about the message not to whom it was directed. We forget about that. Put that aside. The words I'm going to kill you or I've forgotten what Mr. Elwood's mother said to him. Drop dead. Thank you. Those words have very different context among friends among colleagues among family members even among strangers. Sometimes I'm sure if we went through the comments section of any daily newspaper today we'd find some of those words. Are they. I mean I'm just a little concerned that by ignoring one you're asking us to really ignore one aspect of context while you're resting on context. How does that work. The defendants statements the defendants experience if you look at the test the relationship the statements in a prior in the previous exchange that all comes in. That is all relevant for the reasons you said not his his subjective beliefs that has subjective belief gets to something else. Someone can be under. That's not part of the context in your world. Right. We have to say that's not relevant context. That's not context because it doesn't get to the nature of the harm. Statements can be objectively terrorizing to somebody. Someone can say I had no idea. I thought we were in a relationship but I'm correct in understanding that in your view context cuts off there. Yes. OK. And the last question I hope we live in a world in which people are sensitive and maybe increasingly sensitive. As a professor you might have issued a trigger warning from time to time when you had to discuss a bit of history that's difficult or a case that's difficult. What do we do in a world in which reasonable people may deem things harmful hurtful threatening and we're going to hold people liable willy nilly for that. I mean again the solicitor general says a statement that's based on its content and context putting aside its intentions I suppose it's threatening the reasonable person is inherently harmful. How do we talk about history. The first point I would emphasize Justice Barrett made the point well it has to be a serious expression of an intent to cause unlawful physical violence. So someone feeling uncomfortable but we have to put intentions aside. Correct. Put that aside. All right. That's just in its content and context not looking at intentions. Right. It's harmful that it has no First Amendment protection under the test that's being surveyed here. And I would just again put to you aren't a lot of things harmful that we talk about and have to talk about. Difficult offensive to reasonable people are some of our history because that some of the courts cases might even kind of offensive is not the standard. You're saying physically harmful. It has to be physically harmful. And this is a crucial point. It gets to the a lot of the points made in that fire brief aren't talking about points. So I said someone's here physically. They're physically harmful to me. They put me in fear and there are people reasonable people who say that about difficult subjects. So I take the friendly amendment from my friend across the bench and still ask you the question. The question is would a reasonable person in that position not the eggshell defendant if you will with a reasonable person experience statements as a serious expression of an intent to cause unlawful physical violence. That's a high standard. And we would say it doesn't allow for the sorts of concerns that you just articulated. So general I want to take it as a given that this is a high standard and two and a half years of sending somebody unwanted e-mails when that person has consistently tried to block them and tried to stop them. Some of those e-mails being pretty violent. Die. Don't need you. F off permanently. Others of those e-mails suggesting pretty strongly that he is watching the person. Only a couple of physical sightings with it was that you in the white Jeep. So I want to take it as a given that this can be objectively terrifying. Here's my question for you though. Why. What would you lose. I mean I think that there's a question for both of you. Mr. Elwood it's like you know tell me about the cases that I should be concerned about. But I think I have a flip side question to you. Like how could you not be able to prove at least if it was a recklessness standard. How could you not be able to prove this case with a recklessness standard. Three points first. As you picked up whatever First Amendment standard governs here governs in the civil context which includes the school threats that Justice Barrett talked about includes domestic violence cases where a victim is afraid. And so the loss here is not only the criminal context the losses in the civil context. Second as to what the loss is it's both delusional individuals and devious individuals a delusional individual who is a stalker will often say I believe we were in a relationship. I thought what I was saying was benign. And it's possible they could believe that. And yet once they're really robust they can then turn violent which means the following. Do you have to wait until the person actually engages in violence before you do something about what is an objectively terrorizing threat. And this is crucial for the law to be able to protect you saying I want to follow up on Justice Gorsuch's questions to you about stalking. He was asking you about physically following people and you said Colorado has such a statute. Can I finish please. Yes. Are you saying that you could not have prosecuted this under any but this statute because it was fully verbal the evidence of physical stalking here are the statements. There were no independent sightings. She didn't know what he looked like. So she didn't have evidence that he actually was followed her around other than his statements suggesting that he was. So there is no way that you could prosecute this without provoking this First Amendment question. The statute the prosecution was under the stalking law. They invoked the First Amendment saying these were statements. The defense was these were true threats and that's how it was decided by the Court of Appeals. Thank you counsel. Justice Thomas one brief question. The you rely on the reasonable recipient standard reasonable person standard. How would you and you did mention that the senator could have been delusional. How would you monitor the distance between a reasonable recipient and a delusional recipient in establishing your context the reasonable recipient ensures I've referenced earlier to Justice Gorsuch did not be an eggshell defendant having essentially idiosyncratic characteristics. So it's in the position that someone was in. What would a reasonable person perceive vis a vis it being an expression of physical violence you're putting a lot of weight on that. And I think that's why you're getting so many questions about intent. It's as though that demonstrates the how the recipient feels whether or not it is to be considered a threat. And you said that you the recipient is not eggshell. But how would you determine that the way you determine that is if someone said I specifically as the person have these particular characteristics that are more idiosyncratic they wouldn't count as to the use of the standard. This is what the court uses in the Fifth Amendment case is someone in custody. It is also what is required in a self-defense case. What would a reasonable person in that situation view as a serious cause to use self-defense. So the law uses these standards all the time and generally doesn't allow the eggshell defendant to define the category. I think you're getting the problem you're going to run into is the same one that Justice Gorsuch mentioned and that is it doesn't have to be eggshell. That we're more hypersensitive about different things now and people could feel threatened in different ways. So I don't know how you're monitoring that as what if it's now that people are more sensitive that that is now considered the reasonable person. The sensitivity has to be towards unlawful physical violence and that is something outside what might make someone uncomfortable or even hurt their feelings. Some of the statements that Chief Justice read to you are not threatening in and of themselves and yet someone could be triggered by those statements or hypersensitive about those statements and feel threatened. And what I'm trying to figure out is if we accept your argument about context, how do we monitor that reasonableness that seems to now be on a sliding scale? There is both the requirement of a jury making determinations of fact-finder and independent plenary review which happens here at the trial court and the court of appeals. And I also would give you the lived history we have of the last 50 years. Almost every circuit uses an objective standard. Now one could make a move, Justice Thomas, don't judge it by the reasonable listener, judge it by a reasonable speaker. That would be an alternative objective standard that would avoid the harms that I noted to Justice Kagan. Justice Alito. I'm still a bit confused by Justice Kagan's question and your answer to her. You accept that this ban was delusional. You said to her I couldn't go under recklessness. You couldn't prove, the prosecutor couldn't prove the case. Let me respond to that. I didn't get to that point. If you wanted to apply a reckless standard, I think the proper thing would be to remand it to allow the court of appeals. That judgment and that analysis wasn't under our standard. It wasn't used. If that were the position to prevail, we think remand would be appropriate. I'm assuming he was convicted and one of the reasons for his sentence for threatening his wife, obviously the conviction was more than enough to stop him from doing any more threatening of his wife. I'm assuming this arrest was more than enough to stop him from sending any more unwanted texts to this woman, correct? She left the state. I know her emotional distress was great. And whether there's a civil cause of action, I don't know. But that's not my point. My point is at what point, and I think that's what Justice Thomas was saying, do we in not protecting the First Amendment say an objective standard alone is okay with speech that relies always on context? And yes, and I know there are delusional people who kill individuals and we want to protect people from that. But at what point do we do it by defining crimes without some sort of knowledge element by the person? In Justice Thomas' separate statement alone, he said it would be an odd result to put true threats in the most protected First Amendment area. Right now, private defamation cases can proceed without any heightened sienta requirement. The limitation on punitive damages only applies on matters of public concern. The fighting words context, those prosecutions can proceed without a heightened sienta requirement. Both of those situations involve direct harm on individuals that happen. Justice Kagan? Justice Kagan? His sentence here, how much does his sentence here rest on or maybe not how much? Was it relevant at sentencing his prior convictions for making threatening communications in 2003 and then in 2011 as activity of statements that would be threatening to the public? The stalking statute prescribes a one to three year sentence that was enhanced up to six years because of the prior convictions. Other evidence was presented, including his mental health. The judge went for four and a half years. And then at the beginning of your brief, you start quite helpfully by saying a too broad definition here will limit protected speech. A too narrow approach will harm the individuals and communities terrorized and silenced by threats. Certainly agree with that, and I think the questions have explored that. I just want to get you again on a recklessness standard. What's the problems with a recklessness standard from your perspective that seems to capture some of the concerns you've heard while leaving the defendant? Two answers. The first answer is recklessness does require some proof of what a defendant knew. He then or she then would disregard it. But proving knowledge in the case of someone who can say because they're untethered from reality, I didn't mean it, could still allow them to escape accountability. And again, this would apply in both the civil and the criminal context. So it has broad applicability. A second point I would note is recklessness is the standard for public figures in defamation cases, but that's about the reputation of a public figure. Here it's about safety. And the problem that I would note vis-a-vis that standard is we're going to raise the standard for public figures to recklessness because they can defend themselves in the marketplace of ideas. Now the problem here, if you try to use counter speech to a threatening stalker, you make it more likely that it will escalate ultimately into life-threatening violence. So we don't believe the case, if you compare it on all fours, to public  threatening, that's a sign of harm. Counter speech isn't a defamation. Thank you. Mr. Sparrett? Who is the reasonable person? Would it be just as we might say in the Fifth Amendment context for custody, is it kind of a general reasonable person or say if something happens on a college campus is it the reasonable college student, which might be different? Or as in Alonis, the reasonable teenager on the Internet in a Facebook gamer group, one of the cases that was cited then and now, it is in the context that the person is in and it's important because the norms may be different. People may talk differently on a sub-gamer Facebook group. Well, that's not quite what I'm asking because I can look at a college classroom say or a law school classroom and I can say if Justice Gorsuch or I were sitting in that context, let's imagine a professor who wants people to understand just how vicious it was to be in the Jim Crow South and puts up behind them on a screen a picture of a burning cross and reads aloud some threats of lynching that were made at the time. Purely educational purpose in the teacher's mind. But students feel physically threatened. They fear for their safety because they don't understand it. Whereas if Justice Gorsuch and I are looking at that situation, we'd say well a reasonable person would understand the educational context of that. So how could the student think of it? So I think context doesn't get you all the way there. I think it's who is the reasonable person. So who is it? It's a reasonable person in the situation. But in that situation, an educational setting where there really is no threat of direct physical violence to a person, it would be objectively unreasonable for anyone to see that as a threat. If it's not a threat of violence that the person is worried about their safety. But the person is reading in the first person an account of what was said and threats of lynching. So they're using the first person and saying it. I understand how it makes them uncomfortable, but unless that person can, again, reasonably perceive it as a threat to their safety in that situation, it wouldn't be a true threat. So I guess what I'm getting at is there's no protection built in. We might have differences about who we think are the eggshell audience or not. And I was just trying to get you to answer in a way apart from context whether there's any way to take account of who the reasonable person is. I mean, maybe it's the case that Justice Gorsuch and I or Justice Sotomayor and I could sit in that classroom and think that we're reasonable people understanding everything you say. But maybe it's the case, Justice Thomas talks about changing attitudes. Maybe it's the case that nowadays people would be more sensitive to that and people would say a reasonable black college student sitting in that classroom would interpret that as a threat that might materialize into actual physical harm. The context of a college classroom or, to get back to rap music, a concert makes it unreasonable to view yourself as being threatened given what is going on. And that I do believe would control. Thank you. Justice Jackson? Yes. Can I just, I just want to clarify just so that I can be sure I understand. So you were talking about the reasonable person with Justice Barrett. And is your standard the reasonable person in that situation would have perceived the statements as a threat? Is that what you're saying about the reasonable person? I would say a reasonable person in a classroom could not and would not perceive general teaching as a true threat. All right. But there's no element of this or no thought about how the statement was meant. Your view is that the subjective intent of the speaker is irrelevant. That's correct. Okay. Thank you. Thank you, Counsel. Mr. Fagan? Thank you, Mr. Chief Justice, and may it please the Court. Just to make clear what's on the table, the question presented as framed by Petitioner invokes only a specific intent and  the answer to the question presented is no, because at a bare minimum recklessness suffices. Everyone agrees that there is a category of unprotected speech known as true threats, and everyone agrees that in order to fall in that category, it has to be a statement that a reasonable person not just could but would interpret as a serious threat to unlawful violence. And then we're basically just having a policy debate about how much breathing room is necessary. And I would urge this Court to allow legislatures, many of which do adopt heightened mens rea requirements because of precisely the concerns that have been articulated, to have that shake out on their own, because there are a number of questions that have been raised, and I'm not going to go into detail here or detail what those are. Just one quick question, Mr. Fagan. Where does this recklessness standard come from? Well, to be clear, Your Honor, our front-line position is that there shouldn't be a recklessness standard at all. It's not historical. It would just be a gloss in the way that this Court, I think, has put a gloss on obscenity and other doctrines because of the essentially judicial policy assessment that the First Amendment requires additional breathing room. But here we'd urge you that this kind of inherently... But you're saying that the historical record supports, clearly supports, that no mens rea is required? That it's negligence, an objective standard? What do I do with the legion of English cases, American cases, true threat cases, all of whom required mens rea? Your opposing counsel was quite right that you take a few stray statements from a few cases, but every other case talks about a mens rea. Well, respectfully, Your Honor, we disagree about the history. He basically relies on three buckets of history. Number one are libel cases. Even libel cases under modern doctrine don't have a specific intent or knowledge requirement. Number two are... You hit the nail on the head. Modern cases. Go on. Well, the Court has not deemed those to be libel cases. I'm not going to go into that for a while. But you're making quite a broad statement that the historical record supports your position. Well, Your Honor, let me jump right to it. The only way in which he engages in putting aside breach of peace cases that inform the objective fighting words doctrine and the statutes that expressly require intent to extort, if we just look at the pure threatening letters, I'd commend to the Court King v. Girdwood, a 1776 case that's about jury instructions that includes no jury requirement of intent. Or let's take counsel... Intent is different than knowledge. And he's saying I look at a lot of the indictments on the cases that you cited to, and all of them talked about a willful purpose or a knowing purpose. Your Honor, the only things that were submitted to the jury in Girdwood were knowledge of the contents of the letter and whether those contents in themselves conveyed a threat. But let's look at another case, their favorite case, the only case they really have on threatening letters, Regina v. Hill, which is a later English case. In that case, there was some dispute as to what the defendant intended. Did he intend to burn standing corn, corn in the field, or stacked corn, corn that had already been cut and put in the barn and was personal property? And as to that question, the defendant's intent was not... The defendant stated what he intended, which we do think can be dispositive. The court said we'll see if we can interpret the letter that way. Intent is never what a defendant says is never dispositive. It's always contextual. The issue is that an objective standard keeps out, as it happened in the trial here, the defendant's understanding. Well, Your Honor, we don't think that a defendant's intent in sending a communication is categorically irrelevant. We don't think that the defendant's intent or knowledge is necessarily irrelevant. Alonis got on the stand and testified as to what he was thinking. What he said was... You just said it's not necessarily irrelevant? Well, Your Honor, I want to distinguish between a couple of things. So it's not necessarily irrelevant. Is that fair? If I could expand on that point, I would like to not leave it abstractly hanging. Let me just talk about two different things. One is what a speaker is thinking at the time the speaker makes the statement is relevant in the same way an objective inquiry into reasonable suspicion or probable cause. You might take into account what the officer was thinking when he stopped the car, because that would just inform what a reasonable person might think. Then we've got the... I take that point. But even that wasn't permitted here, right? I mean, no evidence of his knowledge was permitted. Well, Your Honor, what I think you wanted to introduce was evidence that might go to something like mental delusions he was suffering, that he was having a conversation... Whatever. He wasn't allowed to produce any evidence about his mens rea, and I think he just admitted that even under your version of the objective standard, that's relevant contextual evidence. It can be, and to the extent he was forbidden from raising the statement... That was there. Your Honor, I'm not going to defend a particular evidentiary ruling in this particular prosecution. All right. Let me back up and just ask you another question about the history, because I read it a little bit differently than you do, I think. I look at... You said Girdwood, but even there the jury was asked whether he knew the contents of what he wrote and whether the terms of the letter conveyed an actual threat. So there is knowledge there, I think. Voucher was heavily relied on by you and your friends. But the next sentence you don't quote is, No one who received the letter could have any doubt as to what the writer meant to threaten. And I guess I just put the question to you this way. Criminal law. Vicious will has been an essential part of it. This Court's made that clear since Morris set. And I'm just not aware of many circumstances in which someone can be sent to jail for four years, found guilty of a felony, without any evidence of mens rea coming before the jury. So, Your Honor, I think that the Morris set presumption is a presumption about legislative intent. And legislatures, to be clear, don't have to adopt an objective standard. This Court's opinion in the loneness suggests that... I understand that. I appreciate that. But you'd agree it would be a very felony not to involve any question of mens rea. It's highly unusual. It's not unknown to the law. It is uncommon. But let me list a few reasons, if I could, of why legislatures might have the calculus in favor of criminalizing the speech under an objective standard. Number one is that it enables very devious defendants. Again, when Alonis did get on the stand, he said, I didn't care what other people thought. And his actual posts invoked the First Amendment and true threats doctrine. Number two, and this applies to any standard, Justice Kavanaugh, including recklessness, but it's obviously much worse with specific intent. It impedes law enforcement from actually arresting and bringing charges in an early stage. They have to wait a lot longer for the objective evidence to build up. Alonis isn't uncommon in his fact pattern. We are currently sitting on matters that we do not feel comfortable charging at the moment, where you have things framed in wish and hypothetical. And I wish someone would kill you. If only I could come do it, I would walk right up to 19 Elm Street. That sort of thing is a kind of thing that a clever threatener is going to use. And we simply cannot intervene, because we need to be very, very, very sure we're going to get a conviction. Just to make sure I understand, you think someone can be convicted for saying, I wish someone would kill you? Your Honor, repeated statements of that sort, for example, the court might look at Alonis, who is reconvicted on, who's just recently reconvicted for threatening an assistant U.S. attorney, his ex-wife, and his ex-girlfriend. Okay, so if it's, I wish someone would kill you, and the person who said that doesn't get to testify and say what he meant. He can say, well, of course I didn't mean it, and here's why I didn't mean it, or something like that. Oh, he can testify to that, and the jury can see what they think of it. I assume it's okay if I answer your question. I think I'll let myself go on. Of course he can, Your Honor. But my point is, they have to, first of all, we're never doing these things in isolation. Context always matters. And the prosecution needs to build up enough circumstantial evidence, because if we don't actually manage to convict, we have put the victim, not only to the rigors of the trial, the lesson the victim draws is, even the law can't protect me. And in these cases, that is very important, and should at least allow legislatures to have a mens rea of recklessness, which is something that if you answered the question presented yes, which would be the only basis for reversing the judgment below, legislatures would no longer be empowered to do. Thank you, Counsel. Justice Thomas? Justice Alito? Justice Sotomayor? Justice Fagan? Would I be right, Mr. Fagan, that there's a large difference between saying that in most cases, a person should be allowed to take a stand and testify as to his state of mind, and on the other hand, saying that a prosecutor has to prove something about his state of mind? In other words, the first just going to a general sense of context about what a reasonable observer might think about the conduct or the speech, and the second being an element of the offense. There's a big difference between those two. That's absolutely right, Justice Fagan, and that I think informs the discussion I was having with Justice Gorsuch, which is, I mean, the speaker is there. The speaker intends to convey something that may not only say something about how a reasonable observer would perceive it, but may give you some additional context as to, for example, if it's a spoken threat, tone, or whatever. I'm wondering what you think of this criminal-civil dichotomy in this independent constitutional rule that there can't be a crime without knowledge or even recklessness. Yet we are uncomfortable with the thought, uncomfortable enough that when we say, you know, we have to be really convinced that the legislature wanted that. That's a separate issue, it seems to me, from this First Amendment issue, or is it? I mean, is there something to the fact that these two things are coming at us at the same time and we can kind of connect them in the way that Mr. Elwood suggests and come up with a rule of the kind he wants? Well, I agree that they're separate inquiries, Your Honor. For a category of unprotected speech, it's just unprotected, and the legislature can either provide for civil or criminal liability. The instinct that I think you're channeling that we're uncomfortable with in criminal law finds its way into other doctrines. Number one would be the presumption of mens rea that I was discussing a little bit earlier, that the Court applied in alonus and made clear in alonus was not deciding the separate constitutional issues. And another one would be, and you can really see this if you look back at the older cases like New York Times against Sullivan, that the criminal law comes with additional constitutional protections in the Fifth and Sixth Amendments. You need a unanimous jury. You need proof beyond a reasonable doubt. And precisely for that reason is why New York Times against Sullivan was actually more concerned about civil liability than criminal liability. As far as the broader distinction, where I think counsel for the other side is suggesting this isn't going to affect civil protection orders, I don't really understand why. I mean, I suppose the Court could just say that in its opinion and that would be helpful, but there's no logical basis for distinguishing between a civil protection order that depends for its definition on some modicum of proof that somebody committed an actual criminal offense, which must be defined by specific intent or knowledge, and the actual criminal law question that we're debating here. Thank you. It seems like in figuring out the mens rea issue, we're making quasi-policy judgments about where to draw the line. And in thinking about that, you alluded to this, but I'd be interested in you just telling us, from the federal government's perspective, what are the problems that you see that would be caused by adopting petitioner's rule, like real concrete kinds of cases that would go unarrested, unprosecuted? I tried to jam this in a little bit earlier, Your Honor, but to expand on it a bit more. Number one, there are delusional stalkers, or not just stalkers, like delusional threateners, and we have to accept their harms. There are also devious ones, like Alonis. I'd commend to the Court, looking back at some of the statements he made that are recounted in the Court's opinion in that case. We clearly see someone trying to toe the line, and that's exactly what these people do. And we're not prosecuting them on the basis of one statement in isolation, like I'm going, you know, I hope that someone kills you. It's that combined with knowledge of someone's address, et cetera, that just walk right up to the line, and then they hope that they can get off scot-free because of some heightened intent requirement. Number two is that, as I was suggesting earlier, and this is true of both recklessness and knowledge and specific intent, but obviously more true the higher you get up the mens rea chain, because we're going to have to prove subjective mindset through circumstantial evidence, which we're allowed to do, but that's really all we're going to have. We're going to have the statements themselves, and if we're talking about an online threats case, and that's going to be about it. So we have to wait quite a while before the statements rise to the level where we are comfortable bringing the prosecution and sure that we're going to get a guilty verdict, and we need to be more sure in this context than we feel like we need to be necessarily in other contexts. Do you consult with the victims on that? You said you were worried about the victims. Do you consult with the victims? Like, no, go ahead. Your Honor, in some cases we might. In other cases we might have a reluctant victim, but I think the critical point is no matter what, we're going to need the victim to testify, and that's going to be an ordeal. We're going to need the victim, you know, the victim will be aware that the trial is ongoing. There's a brief from the victim in this case that details some of these harms, and if we're unable to get a conviction, that's going to send a message to the victim that I'm on my own, the law can't protect me, notwithstanding whatever Band-Aid they want to put on civil protection orders which themselves aren't going to last forever and raise substantial due process concerns and would be called into question by the rule that petitioner is urging unless we're going to have some kind of illogical line that's inconsistent with this court's precedent, as Justice Kagan has, I think her questions have gotten at. One last question, which is, are you aware of statistics or studies, and this would be hard, but of murders, school shootings, domestic violence incidents that perhaps could have been prevented if threats had been taken more seriously beforehand? I'm not sure, Your Honor. I mean, I don't have any numbers for you. I can tell you, and I think this probably reflects the experience from which your question draws, is that there is frequently, after one of these horrific incidents, some question of why didn't you intervene and why didn't you respond earlier? And I imagine petitioner's counsel is about to get up and say, well, you can intervene. You can send an agent over to check out what's going on. And we did exactly that in Alonis. And what happened? He sent another threat, the threat against Little Agent Lady. And we had to charge that threat, too. It did not deter him. It did not stop him. We recently reconvicted him for another series of threats, including threats to an assistant U.S. attorney. It is very important that the prosecution have some ability to intervene at an earlier stage, and legislatures shouldn't be precluded from making the judgment that those kinds of harms are more important, particularly in the case of reckless defendants who decide that they will inspire fear in others to further their own selfish ends. We successfully ran the Boston Marathon on Monday, thankfully. If someone had called up to the police station and said, yeah, I am on the 10th anniversary, I am Tsarnaev Part 2, I don't think that the person should be able to get off for making a threat simply by saying that he thought the Boston Police Department had a better sense of humor. Thank you. Justice Jackson? Yes, but let me just ask you, I perceive a difference between your position and the government's, excuse me, and Colorado's position as to whether or not the defendant can bring in that evidence. So I just want to be clear on that. This is a point that Justice Gorsuch made and Justice Kagan made. In your very last hypothetical, would that defendant be allowed to at least testify to his state of mind in making those threats? Yes, Your Honor, but I do want to clearly differentiate between two forms of subjective mens rea that type things that might come in. One is just evidence of what the defendant was thinking when the defendant sent the statement. That sort of thing could come in. But evidence about delusions and illnesses and just the statement that I have some sort of mental deficiency that impairs me from understanding how a reasonable person would interpret my statements. The court made clear in Clark v. Arizona that a defense of mental illness or mental incapacity doesn't have to negate criminal liability in the first instance. It could be channeled into some kind of insanity defense. And what the defendants in this case and defendants generally are trying to do is have their cake and eat it too. They don't want to claim that they're insane. And then they claim that they should be able to defend against mens rea based on asserted mental infirmities of the sort I just described. Your view, you would only have to prove the objective reasonable person standard and that the government would not have to show anything about subjective intent even if evidence related to subjective intent was admitted. As a constitutional matter, we think that back to what I was saying to Justice Kagan, as a constitutional matter under the First Amendment, we think the only thing that the elements would require is that a reasonable person would, not just that some person could, but a reasonable person necessarily would interpret the statement. A reasonable person would, beyond a reasonable doubt is what I mean by necessarily, interpret the statements as a threat of unlawful violence. That's the constitutional floor. Many legislatures go above it, but they don't absolutely have to for all of the reasons I was expanding on with Justice Kavanaugh. Society doesn't need to accept that these harms are necessarily going to occur and allow people to inflict them. And they can cause... Just a few points. The burden is on the proponents of restrictions on speech to justify it both as a legal matter, as a constitutional matter, and as the practicalities of bringing it. I think the burden is on them to show that it would cause a problem. On the constitutional end, I would say that to the extent that you think that the sides are in equipoise about tradition and history and doctrine, the tie goes to speech. And I think that they aren't. I think that when you have, on one hand, Virginia v. Black, and when you have on other cases, like Virginia v. Hill, where the government admitted that they considered this objective intent, they didn't just look at the reasonable meaning of the words. They looked to see what he meant by them in order to determine whether it was a threat. And if I remember correctly, they directed a verdict of acquittal as a result. In terms of practical implementations, when Colorado argues that the majority rule is an objective one, that's talking about the federal constitutional rule. If you look at the majority of courts of appeals, they say that's the constitutional rule. But the most common mens rea for threat statutes is purpose or intent. More than 20 states, their main threat statute uses purpose or intent. I'm sure more have recklessness. And, again, they haven't shown us a problem in any of those states. The federal government has been living under this rule since Alonis. And the examples that the government gives are devious defendants, people couching things as wishes and so forth. I would say that the difference should not be that difference between an objective standard and a subjective intent. Because, after all, you have to prove under an objective standard when somebody says, I wish you would die, that you would have to say, well, he means that to mean I'm going to kill you. And the only difference, ordinarily, when you were talking about how you prove to the jury, you prove it the same way either way. The only difference is whether or not the defendant gets to put forward their explanation of what those words mean. And Justice Scalia, writing for the court in United States versus Williams, said in a speech case, child pornography, courts and juries every day pass upon knowledge, belief and intent having before them no more than evidence of the defendant's words and conduct from which an ordinary human experience, mental condition may be inferred. And, again, for somebody saying, I wish you would die, he might get up and say, oh, you know, I thought it in the most benign way possible. But the question is, did you think that that would cause that person fear? And if they can say, oh, I emailed this person 20 times saying I wish that they would die, but I didn't mean for them to feel fear about it, the jury can draw the conclusion that most people would draw that the guy is guilty of sin. Similarly, the favorite excuse of regulators is that people could just get up and say, it's a joke. But if you emailed the Boston Marathon and say, I'm going to be sorry in part two, and then you don't get to just say, oh, it was a joke. The question is, did he think you would cause harm? Or in the government's standard, you know, did they disregard, consciously disregard the risk that it would put people in fear? There's only one way to answer that question. So, again, this is a rule that isn't going to affect a lot of convictions. I think most convictions will come out the same way. But it will affect speech beneficially in much more ways. It will have an outsized impact because, again, the focus is on the thing that matters. It has been a bulwark in speech cases. The thing that speakers know, their intent. They don't know, you know, what a reasonable person standard means. We could talk about it for another hour and still not know who a reasonable person is in this case or how a reasonable person would interpret that. Whereas the subjective intent, as a Williams opinion put it, that's a true or false matter. That's something juries decide every day. Further questions? Thank you, counsel. The case is submitted.